# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff*, | ) |
| v. | ) No. 26-cv-10948 |
| | ) |
| ALEXANDRIA WILLIAMS, M.D., | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| *Defendant*. | ) |
| | ) |

## COMPLAINT

For five months in 2018 and 2019, Dr. Alexandria Williams ("Williams") sat on her couch in her Cambridge, MA apartment and clicked through one fraudulent medical order after another. In mere seconds or minutes, she signed her name to medical orders that she did not write—and, in many instances, had not read—for Medicare beneficiaries she never met. The orders were replete with false statements claiming she had examined or treated these beneficiaries when she had not. She was paid for each order she signed, so she clicked through quickly in her spare time to supplement her income as a full-time medical resident. By signing these orders, Williams was prescribing medically unreasonable and unnecessary durable medical equipment ("DME") to more than 800 Medicare beneficiaries with whom she had no prior or continuing relationship and—for the vast majority—whom she had never spoken to or even attempted to contact. Williams thereby defrauded Medicare of over $600,000. After she was caught, she took multiple steps to cover up what she had done.

The United States of America brings this action to enforce violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, arising out of Williams' conduct. More specifically,

from at least December 6, 2018, to April 30, 2019 (the "Relevant Period"), in violation of the FCA, Williams caused the submission of approximately $632,274.29 in false claims to Medicare by: (1) causing to be billed to Medicare claims for DME that were not medically reasonable or necessary, and (2) making false statements on records that were material to the claims that Medicare paid.  *See* 31 U.S.C. § 3729(a)(l)(A), (B).

## <u>INTRODUCTION</u>

1.      From mid-2017 through early 2019, certain individuals devised an elaborate nationwide scheme to defraud Medicare of millions of dollars by submitting false medical orders for DME for Medicare beneficiaries.  The scheme involved many players, including:

- Telemarketing companies that ran call centers to obtain Medicare beneficiary information and prepopulated fraudulent medical orders;

- Purported "telemedicine" companies that received the prepopulated orders and paid health care providers to sign them;

- Health care staffing companies that recruited the health care providers and connected them with the "telemedicine" companies;

- Health care providers who signed the fraudulent orders; and

- DME suppliers who submitted claims for the fraudulent orders.

2.      One of the participants in the scheme was Willie McNeal IV, who was the owner, president, founder, chief executive officer, and registered agent of Integrated Support Plus, Inc. ("ISP").  ISP was a purported telemedicine company located in Hernando County in the Middle District of Florida.

3.      DME is reusable medical equipment such as orthotic devices, walkers, canes, or hospital beds.  Orthotic devices are a category of DME that include knee braces, back braces,

shoulder braces, and wrist braces (collectively, "braces"). Orthotics can be custom-fabricated, custom-fitted, or—as relevant here—off-the-shelf.

4.      As part of this scheme, telemarketing companies that ran call centers received prepayments from DME companies in exchange for a set number of completed brace orders signed by medical providers (collectively referred to as "brace prescriptions"). The DME companies paid a fixed price to the telemarketing companies for each completed and signed brace prescription. The DME companies would use these brace prescriptions, signed by medical providers, to support claims for braces that they then submitted to Medicare for reimbursement.

5.      The telemarketing companies would make calls to, or receive calls from, Medicare beneficiaries and would obtain medical information from the beneficiaries to fill out the brace prescriptions.

6.      The telemarketing companies would then send the completed, but unsigned, brace prescriptions to ISP, along with payment. ISP's job was then to obtain an enrolled Medicare provider's signature on each brace prescription.

7.      ISP paid numerous enrolled Medicare providers, including doctors and nurse practitioners, to review and sign these brace prescriptions. Some of the enrolled Medicare providers were direct employees of ISP, while other providers were independent contractors for ISP working through health care staffing companies. Williams was the latter.

8.      The enrolled Medicare providers who signed the brace prescriptions for ISP often did so regardless of medical necessity, in the absence of a pre-existing provider-patient relationship, without an examination, and based solely on a short telephonic conversation or with no interaction at all with beneficiaries. ISP sent the now-signed brace prescriptions back to the

telemarketing company.  The telemarketing company, in turn, sent the signed brace prescriptions to the specific DME company or companies that had paid for them.

9.    As a result of this elaborate fraud scheme, Medicare paid millions of dollars for medically unnecessary DME braces.  While ISP profited the most from this fraud (until it was shut down in April 2019), the Medicare providers, like Williams, who signed these brace prescriptions with sham medical exam notes also profited by receiving flat rate payments for each order they reviewed.  Crucially, none of this fraud could have occurred but for the Medicare providers signing these fraudulent DME medical orders.

10.    This is an action against Dr. Williams for her role in perpetuating this fraud scheme, to recover treble damages and civil penalties under the FCA for signing DME orders and false medical records and causing the submission of claims to Medicare based on those orders that she knew were false.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1367(a) because the United States is the plaintiff.  In addition, the Court has subject matter jurisdiction over FCA claims for civil damages and penalties pursuant to 31 U.S.C. § 3732 and 28 U.S.C. §§ 1331, 1345, and 1355.

12.    This Court may exercise personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a). The Court may exercise personal jurisdiction over the Defendant because the Defendant resided in this District when she engaged in the conduct proscribed by 31 U.S.C. § 3729.

13.    Similarly, venue is proper in this jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b).

**PARTIES**

14.     Plaintiff is the United States of America.  Through the Department of Health and Human Services ("HHS"), and more specifically through the Centers for Medicare and Medicaid Services ("CMS"), a component agency within HHS, the Government administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare").

15.     Defendant is Alexandria Williams, M.D., NPI number 1538519442, who is an Illinois resident.  At all points relevant to this Complaint, Dr. Williams was licensed to practice in Massachusetts as a Doctor of Medicine.

**LEGAL FRAMEWORK**

**THE FALSE CLAIMS ACT**

16.     The FCA was originally enacted in 1863 to address fraud on the Government during the Civil War, and it reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.  The FCA broadly creates liability for "all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

17.     The FCA provides, in pertinent part, that any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States Government for damages and penalties. 31 U.S.C. § 3729(a)(1).

18.    The FCA defines "knowingly" to include "actual knowledge of the information," as well as actions taken in "deliberate ignorance of the truth or falsity of the information" or in "reckless disregard of the truth or falsity of the information."  *Id.* § 3729(b)(1)(A).  "No proof of specific intent to defraud" is required to establish liability.  *Id.* § 3729(b)(1)(B).

19.    The FCA defines a "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2).

20.    The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id.* § 3729(b)(4).

21.    Violations of the FCA carry mandatory per-claim civil penalties, plus three times the amount of damages that the Government sustains as a result of a defendant's actions.  *Id.* § 3729(a).  Based on statutory adjustments for inflation, for violations occurring after November 2, 2015, and assessed after July 3, 2025, the minimum per-claim penalty is $14,308 and the maximum per-claim penalty is $28,619.  *See* 90 Fed. Reg. 29445 (July 3, 2025).

## THE MEDICARE PROGRAM

22.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, known as the Medicare Program, to pay for the costs of certain healthcare items and services.  42 U.S.C. § 1395, *et seq*.  Entitlement to Medicare benefits is based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426-426-1.  Individuals who are insured or receive benefits through Medicare are often referred to as "Medicare beneficiaries."

23.     HHS is responsible for the administration and supervision of the Medicare Program.  CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program.

24.     Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of "medical and other services."  *See* 42 U.S.C. §§ 1395j-1395w-5.

25.     Medicare reimburses only those items and services, including DME, furnished to beneficiaries that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," 42 U.S.C. § 1395y(a)(l)(A), a requirement referred to colloquially and herein as "medically reasonable and necessary."

26.     Medicare Part B is funded by insurance premiums that enrolled Medicare beneficiaries pay as well as by contributions from the Federal Treasury.  Eligible individuals who are 65 or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums.

27.     The United States provides reimbursement for Medicare Part B claims from the Medicare Trust Fund through CMS.  To assist in the administration of the Medicare Part B Program, CMS contracts with Medicare Administrative Contractors ("MACs").  42 U.S.C. § 1395u.  MACs are responsible for processing the payment of Medicare Part B claims to providers and suppliers on behalf of CMS.

28.     In addition to processing claims, MACs can issue Local Coverage Determinations ("LCDs"), which set forth criteria for coverage requirements for specific items or services.  *See* 42 U.S.C. § 1395ff(f)(2)(B).

29.     Noridian Healthcare Solutions, LLC ("Noridian") is the MAC that processes DME claims under Medicare Part B on behalf of CMS in Massachusetts.

30.     DME supply companies must enroll with Medicare in order for Medicare to cover claims for reimbursement of DME items that those suppliers provide to beneficiaries.

## STANDARDS OF MEDICAL PRACTICE

31.     According to the Board of Registration in Medicine in Massachusetts, the basic requirements of acceptable medical practice include the following: "To be valid, a prescription must be issued for a legitimate medical purpose, by a practitioner in the usual course of his or her professional practice.  As with every aspect of medical care, a physician's prescription practices should be guided by medical knowledge, best practices, professional guidelines and consensus standards."  *See* Commonwealth of Massachusetts Board of Registration in Medicine, Prescribing Practices Policy and Guidelines, Policy 15-05, https://www.mass.gov/files/documents/2016/10/wz/policy-15-05.pdf (adopted October 8, 2015) (last visited Feb. 10, 2026).

32.     For a provider licensed in Massachusetts to write prescriptions, the provider must have a relationship with the patient and take steps to assess the patient.  Relevant here, for "internet prescribing," there must be "a physician-patient relationship that is for the purpose of maintaining the patient's well-being and the physician must conform to certain minimum norms and standards for the care of patients, such as taking an adequate medical history and conducting an appropriate physical and/or mental status examination and recording the results."  *See* Commonwealth of Massachusetts Board of Registration in Medicine, Internet Prescribing, Policy 03-06, https://www.mass.gov/doc/appendix-b-policy-03-06-internet-prescribing/download (last visited Feb. 6, 2026).

33.     According to the American Medical Association in 2018, a valid patient-physician relationship must have been established "before the provision of telemedicine services, through: (i) A face-to-face examination, if a face-to-face encounter would otherwise be required in the provision of the same service not delivered via telemedicine; or (ii) A consultation with another physician who has an ongoing patient-physician relationship with the patient . . . [with] [t]he physician who has established a valid physician-patient relationship . . . agree[ing] to supervise the patient's care." *See* American Medical Association, 50-state survey: Establishment of a patient-physician relationship via telemedicine, https://www.ama-assn.org/system/files/2018-10/ama-chart-telemedicine-patient-physician-relationship.pdf (last visited Feb. 10, 2026).

### MEDICARE REIMBURSEMENT OF DME

34.     DME companies, physicians, and other health care providers that furnish items and services to Medicare beneficiaries are referred to as Medicare suppliers or providers.  To participate in Medicare, suppliers and health care providers are required to submit applications in which they agree to comply with all Medicare-related laws, rules, and regulations.  If Medicare approves the application, Medicare assigns the supplier or provider a Medicare number.  A health care provider with a Medicare number can file claims with Medicare to obtain reimbursement for medically reasonable and necessary items and services rendered to beneficiaries.  A health care provider with a Medicare number can also write prescriptions or orders for Medicare-covered services without directly billing for these items or services, in which case he or she refers the services.  Medicare providers and suppliers have access to, and

are expected to follow, Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

35.    To obtain reimbursement for DME, suppliers submit claims on a form known as the CMS 1500, or its electronic equivalent known as the 837P format.  When submitting claims to Medicare, suppliers certify on the CMS 1500 that (a) the services rendered are medically indicated and necessary for the health of the patient; (b) the information on the claim form is "true, accurate, and complete;" and (c) the supplier understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws."  Similarly, when enrolling to submit claims electronically, providers certify that they will submit claims that are "accurate, complete, and truthful." https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS10164B.pdf (last visited Feb. 20, 2026).

36.    A Medicare claim for DME reimbursement must set forth the individual Medicare beneficiary's name and unique Medicare identification number, a five-digit Healthcare Common Procedure Coding System ("HCPCS") code that identifies the equipment provided to the beneficiary for which reimbursement is sought, the date of service, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

37.    As with all goods and services, Medicare pays a claim for the provision of DME only if the equipment is medically reasonable and necessary.  Medicare claims must be properly documented in accordance with Medicare rules and regulations.

38.    For certain types of orthotics, such as knee braces billed under HCPCS code L1833, Noridian established an LCD requiring specific documentation and examination

requirements for reimbursement (L33318).  This LCD requires that a provider conduct and document an examination of a beneficiary, including observations related to an "objective description of joint laxity in the knee."  *See* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33318.  According to this LCD, knee braces ordered without this documented examination or objective description are not medically reasonable and necessary and not reimbursable.  A phone call between a doctor and a Medicare beneficiary would not meet the requirements of this LCD.

39.    To conduct an examination of a Medicare beneficiary, a Medicare provider or supplier would need to perform an in-person office visit or telehealth visit.

40.    During the Relevant Period, Medicare Part B covered expenses for specified telehealth services if certain requirements are met.  These requirements included: (a) that the beneficiary was located in a rural area; (b) that the services were delivered via an interactive audio and video telecommunications system; and (c) that the beneficiary was at a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote practitioner.  *See* 40 C.F.R. § 410.78(b) (Jan. 1, 2019).

## FACTS

41.    Williams engaged in a scheme that profited off the Medicare program while taking advantage of unwitting and vulnerable beneficiaries.  Williams ordered costly DME without any interaction with the beneficiaries, based on medical records she did not complete, and filled with information that medical marketers solicited and pre-populated.  In return, Williams received a fee for each record she completed.  Based on little to no review of these false, boilerplate records, Williams ordered over one thousand back, shoulder, knee, wrist, elbow, and other orthotic braces that were not medically reasonable and necessary.  Williams had

no prior or continuing relationship with these beneficiaries.  She provided no follow-up care, nor did she assist or advise them on the use of the DME.

42.      As detailed below, Williams signed brace prescriptions for orthotics she knew were not for legitimate patient care and falsely certified her treatment of these beneficiaries and that the orthotics were medically reasonable and necessary.

43.      When investigators approached Williams about her involvement in the scheme, she made misstatements and omissions on multiple occasions, claiming she had never engaged in the practice of telemedicine or ordered DME for these beneficiaries.

A.    **Williams Agreed to Review (and Authorize) DME Prescriptions in Exchange for $25 per Order Reviewed**

44.      During the Relevant Period, Williams was an internal medicine resident at Mount Auburn Hospital in Cambridge, MA.

45.      To make extra money as a resident physician, Williams explored locum tenens work, including telemedicine.  Williams contracted with MDstaffers, a locum tenens staffing company, beginning in November 2018.

46.      MDstaffers placed Williams with ISP in November 2018.  MDstaffers instructed Williams to review ISP's Orientation PowerPoint and to download an application called DMERx, which allowed Williams to review and sign the beneficiary orders that she was assigned.

47.      Williams received training materials from ISP regarding the process by which ISP received Medicare beneficiaries' information.  These training materials included a description of how a "medical marketer" confirmed the patient's personal and insurance information and "eligibility" before sending to a clinician—i.e., Williams.

12



48.    This training document has multiple red flags, including that the prospective patients were responding to ads in order to receive medical services, that the patient intake was not being conducted by a medical practitioner, and that a clinician was limited in denying brace orders or providing other treatment options (other than the pre-selected braces) to patients. Williams ignored these red flags.

49.    Indeed, while some of the Medicare beneficiaries who received braces via Williams and ISP had requested them in response to an ad, some never requested or wanted these braces at all.  Instead, they received harassing phone calls from telemarketers who had stolen or purchased their information and then generated false orders for them, which Williams signed.

50.    The braces the beneficiaries received were off-the-shelf braces, meaning they were prefabricated.  They were neither custom-fitted nor custom-fabricated for the individual beneficiary.  The beneficiaries were not fitted and often did not receive the appropriate size brace.

51.     ISP told its clinicians that it did not require them to contact the beneficiaries for whom they were ordering braces.

52.     Many of the records Williams signed included much of the same (and often false) pre-populated, boilerplate language.  Many also included pre-populated descriptions of purported conversations that the medical record suggested occurred between Williams and the beneficiaries, including descriptions of Williams' assessments of their conditions and needs.  Those conversations had never really happened.

53.     For most of the orders she signed, Williams did not engage in even a cursory review of the records.  Frequently, Williams spent only seconds between opening the documents sent for her review and affixing her signature.  The records she received were often more than ten pages and contained multiple components, including purported justifications for brace orders, and multiple fields where she had to click to sign.

54.     For example, for Beneficiary 1, who was born in 1925 and resided in Lynn, Massachusetts, Williams spent less than a minute reviewing the prepopulated order form that she received from ISP via DMERx.  Williams also did not speak to this beneficiary.  Nevertheless, Williams prescribed six braces for this beneficiary—a back brace, two knee braces and a suspension sleeve, a wrist brace, and a shoulder-elbow-wrist brace.  The orders Williams signed identified Beneficiary 1's insurance as Medicare.  EZ Fit Medical Group, Inc. supplied the DME and billed Medicare for the six braces on January 29, 2019, with Williams identified as the referring provider.  Medicare paid $2,324.52 in total due to these prescriptions.  None of these braces were medically reasonable and necessary, and all the claims for them were false.

55.     For Beneficiary 2, who was born in 1953 and resided in Rockland, Massachusetts, Williams spent less than a minute reviewing the prepopulated order form that she received from

ISP via DMERx.  Williams also did not speak to this beneficiary.  Nevertheless, Williams prescribed a back brace for this beneficiary.  The orders Williams signed identified Beneficiary 2's insurance as Medicare.  PRV Medical Supply, Inc. supplied the DME and billed Medicare for the brace on January 14, 2019, with Williams identified as the referring provider.  Medicare paid $744.58 due to this prescription.  This brace was not medically reasonable and necessary, and the claim for it was false.

56.     For Beneficiary 3, who was born in 1956 and resided in Templeton, MA, Williams spent less than four minutes reviewing the prepopulated order form that she received from ISP via DMERx.  Williams also did not speak to this beneficiary.  Nevertheless, Williams prescribed six braces for this beneficiary—a back brace, two knee braces and two suspension sleeves, and a shoulder-elbow-wrist brace.  The orders Williams signed identified Beneficiary 3's insurance as Medicare.  Blue Ribbon Medical Equipment LLC supplied the DME and billed Medicare for the six braces on February 26, 2019, with Williams identified as the referring provider.  Medicare paid $2,943.02 in total due to these prescriptions. None of these braces were medically reasonable and necessary, and all the claims for them were false.

57.     Beneficiary 3 received a giant box of the various braces that Williams ordered to their house in February 2019.  Beneficiary 3 did not request or order these braces through their doctor or through an ad.  When Beneficiary 3 opened the box, their mother commented that Beneficiary 3 would look like they were "going to battle" if they wore all of the braces. Beneficiary 3 returned the braces shortly after receiving them.  Beneficiary 3 had never heard of Williams and had no physician-patient relationship with her.

58.     In addition to ignoring multiple red flags when she began working for ISP, Williams continued turning a blind eye to red flags throughout the time that she signed orders for

ISP.  For instance, Williams received complaints that made her directly aware that the beneficiaries did not want to receive the braces she was prescribing.  By way of one example:

> **Alexandria K. Williams, MD**
> Mar 7, 9:04 AM EST
>
> **Hi,**
> **I just spoke to Jessica regarding the exchange I received at my office in the screenshot below regarding a patient who received 2 braces prescribed by me but he did not request them. It looks like it is someone from Massachusetts Sr Medicare Control calling on behalf of the patient. I completed this exam based on the patient intake on 2/7/19.**
> **Jessica requested that I send over this information so that this can be looked into further.**
>
> **Thank you,**
>
> **Alex**

59.     Had Williams spoken to the Medicare beneficiaries for whom she was signing orders, she would have known before this point that beneficiaries who were receiving these braces did not request or want them.

60.     Even after being confronted directly with the evidence that the Medicare beneficiaries had not requested the braces she had ordered for them, Williams continued reviewing and signing orders for ISP.

61.     Williams took no action in response or steps to independently verify the source or veracity of the medical records she was reviewing, approving, and adopting.

62.     Williams did not submit Medicare Part B claims for office visits, either in person or telehealth, for any of these beneficiaries, indicating that she did not examine them in person or provide telehealth services to them.

63.     In total, between December 2018 and April 2019, Williams ordered braces for 851 beneficiaries with whom she had no physician-patient relationship.

16

64.     For approximately 90% of those beneficiaries, she reviewed and signed the brace orders in less than ten minutes.

65.     For each beneficiary record Williams completed, ISP paid MDstaffers $40.  Per her contract with MDstaffers, Williams received $25 for each order she completed.

66.     MDstaffers paid Williams over $18,000 for the records she completed for ISP, for just the few months that she worked with ISP.

B.      **Williams Learned in April 2019 that ISP Was Involved in a DOJ Takedown**

67.     In April 2019, the U.S. Department of Justice conducted a large-scale takedown of many of the actors in the telemedicine and DME fraud scheme that had plagued the country for several years.  Multiple telemedicine and DME company owners and several health care providers were charged on the same date as part of a coordinated effort called Operation Brace Yourself.

68.     ISP's owner, Willie McNeal, was indicted as part of this takedown.

69.     MDstaffers learned of the takedown the day after it occurred.  MDstaffers communicated to all of the providers who had worked for ISP the news regarding the Government's allegations against ISP and instructed all providers to stop work.  Williams received this communication on April 10, 2019.



70.    Williams continued signing orders for beneficiaries through this date, and claims for these orders were submitted to Medicare through the end of April 2019.

71.    Williams was paid for her work at ISP through March 25, 2019. Williams continued reviewing and signing orders after March 25, 2019, but was not paid for work after that date because MDstaffers could not reach anyone at ISP after McNeal was indicted to pay ISP's outstanding balance.

72.    The press release announcing McNeal's arrest encouraged doctors or medical professionals who had been involved with the fraudulent schemes, including through ISP, to call to report the conduct to the FBI hotline.

C.    **Williams Denied and Downplayed Her Role in Signing These Orders**

73.    After learning that ISP was involved in the DOJ takedown in April 2019, Williams made efforts to conceal her actions on several occasions.

74.     In June 2019, Williams sought a letter from MDstaffers attesting to her separation date from the company in early March, a month before Operation Brace Yourself—weeks earlier than either the date through which she was paid or the date on which she stopped work.

75.     Williams moved to California in 2019.  As part of her relocation, she applied for and received a medical license from the Medical Board of California.

76.     On her application to the Medical Board of California, Williams was required to provide "a complete timeline of activities from graduation of medical school to present." Williams omitted any mention of the months she had spent signing orders for ISP—despite the fact that she had done most of the work earlier that same year.

77.     Following the Operation Brace Yourself takedown, CMS instructed the Unified Program Integrity Contractors ("UPICs")—Medicare contractors that conduct audits to identify fraud and abuse in the Medicare program—to review any of the referring providers who had ordered DME through or for any of the companies implicated in the scheme.

78.     Among other actions, a UPIC can identify improper Medicare payments and initiate a repayment process from a provider.

79.     In January 2020, Williams received a request for medical records associated with 20 beneficiaries for whom she was the referring provider for DME from the Northeastern UPIC ("NEUPIC").

80.     Williams responded to NEUPIC in February 2020.  Williams stated that she never worked for any telemedicine companies performing reviews for orthotics equipment and implied that she was not the referring provider for the beneficiaries NEUPIC had identified.

81.     NEUPIC followed up with an attestation letter for Williams to sign in March 2020, but she did not respond.

82.     As part of the United States' investigation, federal agents interviewed Williams in 2021.  Williams claimed to have no memory of doing any telemedicine work or ordering DME— despite having already been contacted by NEUPIC regarding the same conduct.

83.     Later in the same interview, Williams stated she recalled calling patients on the phone "from her couch" in her apartment.  When confronted with the number of braces she had ordered, she stated that it seemed like an excessive amount.

84.     Williams later admitted in an email that she did remember doing this work.  She admitted she found it odd that patients would request so many braces.

## WILLIAMS' FCA VIOLATIONS

85.     Based on the facts described above, Williams' conduct violated the FCA in two ways.  First, she knowingly caused to be presented to Medicare claims for DME that falsely represented that the DME were medically reasonable and necessary.  Second, she knowingly made false statements or records that were material to the claims that Medicare paid.  *See* 31 U.S.C. § 3729(a)(l)(A), (B).

A.     **Williams Signed Medically Unnecessary Orders for Medicare Beneficiaries Replete with False Statements**

86.     A DME supplier must have a signed medical order to submit a claim for payment to Medicare for DME, including, as relevant here, an orthotic brace.  Here, the orders that Williams signed contained several parts: (i) a "Detailed Written Order" containing the beneficiary's demographic information, Medicare number, diagnosis, orthotic device(s) prescribed, previously tried treatments, pain levels, and Williams' purported "treatment goal(s)" for the beneficiary; (ii) "Exam Notes," reflecting the beneficiary's chief complaint, Williams' purported subjective and objective assessment of the patient, and Williams' purported plan and treatment goals for the beneficiary; and (iii) a "Letter of Medical Necessity" for the brace(s)

Williams' was ordering for the beneficiary. These orders that Williams signed, which the DME suppliers relied on to submit claims to Medicare for those braces, contained multiple false statements.

87.     For example, in each order, Williams attested to multiple statements representing that she had completed an evaluation of the beneficiary, discussed the use of orthotics with the beneficiary, and instructed the beneficiary on medical follow-up care. Multiple times throughout each beneficiary's order—including the orders of Beneficiaries 1, 2, and 3—the following attestation appears:

> I, Alexandria Williams, MD, do hereby attest that the above information is true, accurate and complete to the best of my knowledge. I hereby affirm this documentation as part of this patient's medical record.

88.     Each order also contained a statement of medical necessity regarding why Williams was prescribing the orthosis and providing reasons that Williams believed the orthosis was medically reasonable and necessary for the specific beneficiary. But this information was prepopulated by ISP. Williams did not write this information, and, in many cases, did not even review it. The statement of medical necessity and underlying supporting statements are almost verbatim from each order to the next. Williams knew this, knew the statements were false, and yet certified their truthfulness, accuracy, and completeness anyway.

89.     Each order for a knee brace contained additional false statements regarding descriptions of tests Williams allegedly performed on the Medicare beneficiaries that require physical manipulation of the beneficiaries' legs. Indeed, the LCD pertaining to this knee brace required examination of the beneficiaries and an objective description of joint laxity (the looseness or instability of a joint, in this case, the knee) before prescribing those braces. Williams did not perform these tests, but falsely affirmed that she had.

21

90.    For example, for Beneficiary 3, and many others, the order signed by Williams contains a description of a Cabot Maneuver test and a one-legged stand test, with positive results for both, that Williams never conducted.

91.    The Cabot Maneuver is a physical examination technique that evaluates the lateral collateral ligament.  This maneuver involves the patient lying on their back, flexing the affected knee, and crossing the ankle over the extended contralateral leg (a "figure-four" position).  The Cabot Maneuver is a stress test would be difficult, if not impossible, to conduct properly with a beneficiary over a phone call (nor would a phone call have met Medicare's telehealth requirements at the time), and it is certainly impossible to conduct if the provider never even speaks to the beneficiary, as is the case with Williams and Beneficiary 3, and many others.  In short, Williams did not perform the Cabot Maneuver on Beneficiary 3, but Williams attested in Beneficiary 3's order that she did.

92.    The one-legged stand test, or single leg stance test, is an assessment of postural stability and fall risk and involves having a patient stand on one leg and measuring how long the patient can do so.  This test would be difficult, and dangerous for the Medicare population, to properly conduct with a beneficiary over a phone call (nor would a phone call have met Medicare's telehealth requirements at the time), and it is certainly impossible to conduct if the provider never even speaks to the beneficiary.  Williams never spoke to Beneficiary 3, and many others.  In short, Williams did not perform the one-legged stand test on Beneficiary 3, but Williams attested in Beneficiary 3's order that she did.

93.    Further, the order that Williams signed for Beneficiary 3 contains multiple attestations that she examined the beneficiary.  It also contains false statements referencing her conversation with and assessment of the beneficiary, which never occurred.

94.     Williams made false statements and false certifications throughout hundreds of orders that she signed over a five-month period.

B.      **Williams Knew She Was Making False Statements and Signing Orders for Unreasonable and Medically Unnecessary DME**

95.     During the Relevant Period, Williams was enrolled as a Medicare provider.

96.     Under 42 C.F.R. § 424.516(a)(1), Medicare providers must certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations.

97.     Medicare providers must also certify that they meet, and will continue to meet, federal and state licensure, certification, and regulatory requirements, as required, based on the type of services or supplies the provider or supplier type will furnish and bill Medicare.  42 C.F.R. § 424.516(a)(2).

98.     When Williams enrolled in Medicare in 2016, she agreed to be bound by the laws, regulations, and program instructions of the Medicare program.  *See, e.g.*, Medicare Enrollment Application, Physicians and Non-Physician Practitioners, CMS-855I.

99.     In so doing, Williams certified she will "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate indifference or reckless disregard of their truth or falsity." *Id.*

100.    Williams also certified she read and understood "the Penalties for Falsifying Information," including deliberately omitting, misrepresenting, or falsifying any information "contained in any communication supplying information to Medicare." *Id.*

101.    Williams also certified that she understood "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations and program instructions[.]" *Id.*

102.    Williams also stated she would "abide by the Medicare laws, regulations and program instructions that apply to me[.]"  *Id.*

103.    Williams thus agreed to comply with, *inter alia*, 42 U.S.C. § 1395y(a)(1)(A), which provides that "no payment may be made under part A or part B for any expenses incurred for items of services—which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

104.    Williams also agreed to comply with, *inter alia*, 40 C.F.R. § 410.78(b), which at the time provided that Medicare covered telehealth services only if the beneficiary was located in a rural area; the services were delivered via an interactive audio and video telecommunications system; and the beneficiary was at a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote practitioner.

105.    Williams did not submit the claims herself but knew of her obligations as a clinician and as a Medicare provider.  She had previously prescribed DME to patients that she saw in person as a medical resident.

106.    Williams knew that she was ordering braces based on "patient intakes" that were performed not by her or other clinicians, but by medical marketers.

107.    Williams also knew, by way of receiving beneficiary complaints, that beneficiaries for whom she ordered braces complained of receiving them because they did not want or need them.

108.    Williams therefore knew that the DME prescriptions she signed were neither medically reasonable nor necessary.

109.    Williams also knew that her attestations in the records were false when she signed her name to them.  She knew she did not speak to the Medicare beneficiaries, or have any

preexisting relationship with them, did not examine or assess them, and did not make objective descriptions regarding their conditions, such as joint laxity.

110.     Williams knew that Medicare does not pay for medically unreasonable or unnecessary services, or for services that a provider orders without examining, assessing, treating, or even speaking to the beneficiary.

111.     Williams also knew that, when she ordered DME, the DME supplier would submit a claim to Medicare for reimbursement.

112.     That is why Williams told NEUPIC that she had not ordered DME for the beneficiaries, when in fact she did.

C.     **Williams Caused the DME Suppliers to Submit False Claims to Medicare**

113.     For claims for DME to be billed to Medicare, the DME supplier must obtain and maintain a provider's written order/prescription and the supporting documentation.  42 C.F.R. § 410.32(d)(2)(ii).  The suppliers could not have submitted the claims to Medicare without Williams' signed orders.

114.     Williams knew that ISP's medical marketers verified the beneficiaries' insurance information before sending the prepopulated orders to Williams.

115.     Each of the orders that Williams signed identified the beneficiaries as Medicare beneficiaries.

116.     Williams knew that she was signing orders for beneficiaries identified as Medicare beneficiaries and that they were being supplied with the braces she was ordering.

117.     Without Williams' orders for each of the 1,462 braces, the DME suppliers could not have submitted the associated false claims for reimbursement to Medicare.

118.  By signing the orders for each of the 1,462 braces, it was foreseeable to Williams that the DME suppliers would submit false claims for reimbursement to Medicare.

119.  Williams' false statements in the DME orders, as well as her false representations of medical reasonableness and necessity rendered the claims false and fraudulent. Moreover, her false statements and false representations of medical necessity and reasonableness rendered the certifications on the CMS 1500 (including that the services were medically indicated and necessary for the health of the patient) and on the 837P (that the information on the claim form is "true, accurate, and complete") false.

120.  For Beneficiaries 1-3 referenced above, Williams signed orders without talking to the beneficiaries and caused the submission of the false claims identified in those paragraphs. As additional examples, and as with Beneficiaries 1 and 2, Williams spent a minute or less "reviewing" the order before quickly applying her signature, causing the submission of the following false claims for medically unreasonable and unnecessary DME:

| Beneficiary | Claim Date | Supplier | HCPCS Code(s) | Medicare Paid |
|-------------|-----------|----------|---------------|---------------|
| Beneficiary 1 | 1/29/2019 | EZ Fit Medical Group, Inc. | L1833, L2397, L3960, L3916 | $2,324.52 |
| Beneficiary 2 | 1/14/2019 | PRV Medical Supply, Inc | L0650 | $744.58 |
| Beneficiary 4 | 12/7/2018 | Alphamed LLC | L3170, L3916 | $794.17 |
| Beneficiary 5 | 1/2/2019 | Nationwide Prime Medical Supplies, LLC | L0650, L3916, L3960 | $1,734.05 |
| Beneficiary 6 | 12/21/2018 | PRV Medical Supply, Inc | L0650 | $869.63 |
| Beneficiary 7 | 1/16/2019 | PRV Medical Supply, Inc | L1851, L2397 | $1,539.66 |
| Beneficiary 8 | 2/18/2019 | Myrtle Medical Equipment Inc. | L0650 | $888.10 |
| Beneficiary 9 | 12/20/2018 | PRV Medical Supply, Inc | L0650 | $869.63 |
| Beneficiary 10 | 1/29/2019 | Mainlands Medical, Inc. | L3916 | $222.51 |
| Beneficiary 11 | 2/28/2019 | Myrtle Medical Equipment Inc. | L0650 | $889.62 |
| Beneficiary 12 | 1/3/2019 | Rego Medical Supply, Inc | L0650 | $744.58 |

| Beneficiary | Claim Date | Supplier | HCPCS Code(s) | Medicare Paid |
|---|---|---|---|---|
| Beneficiary 13 | 2/15/2019 | Comfort Medical Supply LLC | L0650 | $889.62 |
| Beneficiary 14 | 3/4/2019 | In-Home Senior Care | L0650 | $889.62 |
| Beneficiary 15 | 2/15/2019 | Sacred Heart Home Medical Equipment | L0650 | $744.58 |
| Beneficiary 16 | 2/15/2019 | Mountain Home Care Equipment, Inc. | L0650 | $811.20 |

121.    As a direct result of Williams' actions, Medicare was billed for medically unreasonable and unnecessary DME for 851 Medicare beneficiaries and 1,462 claims, for which Medicare paid approximately $632,274.29.

D.    **Williams' False Statements and Certifications Were Material to the Decisions to Pay Claims**

122.    The false statements and certifications described above had a natural tendency to influence, or be capable of influencing, Medicare's decision to pay the claims that the DME suppliers submitted.

123.    Medicare requires that a doctor ordering services for a beneficiary must do so based on the physician's assessment of that patient.  This requirement is central not only to the regulations surrounding Medicare but also to the basic practice of medicine.

124.    Medicare did not know that the claims for DME based on Williams' orders were not medically reasonable and necessary.  If Medicare had known, it would not have paid the claims.

125.    Medicare would not have paid claims for the DME if it had known Williams' orders contained false statements regarding her examination and treatment of the beneficiaries—indeed, that she had not examined them, had no relationship with them, and did not treat or advise them on the use of DME.

126.    CMS regularly takes enforcement action against those who have submitted claims, or caused the submission of claims, for DME that is not medically reasonable and necessary.

127.    For example, here, CMS instructed the UPICs to review—and, if warranted, suspend—any of the referring providers who had ordered DME through or for any of the companies implicated in the ISP scheme.

128.    Moreover, when the Government learns of violations of these medically reasonable and necessary requirements, it regularly enforces the False Claims Act and other laws that noncompliance violates.  As described above, and as a non-exhaustive example, the Department of Justice charged 24 individuals in connection with Operation Brace Yourself—and many more in subsequent years for conduct connected to this scheme—and has resolved multiple False Claims Act investigations related to same or similar conduct.

## STATUTE OF LIMITATIONS

129.    The FCA provides that an action may not be brought: "(1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last." 31 U.S.C. § 3731(b)

130.    Williams signed orders from December 2018 through April 2019.  Williams caused these orders to be submitted from December 6, 2018 through April 30, 2019.  Medicare paid claims for these orders beginning on December 16, 2018, through May 30, 2019.

28

131.    The United States and Williams entered a tolling agreement as of November 14, 2024, tolling the statute of limitations and excluding for calculation purposes the period from November 14, 2024 through January 31, 2026.  The tolling agreement defines this period—November 14, 2024 through January 31, 2026—as "excludable."  The excludable period is therefore removed from the statutory limit.

132.    The United States is permitted to seek recovery of the entire universe of claims that Williams caused to be submitted to Medicare through her work at ISP.

## CAUSES OF ACTION

### COUNT I – VIOLATION OF THE FALSE CLAIMS ACT
### Causing False Claims to Be Presented for Payment
### (31 U.S.C. § 3729(a)(1)(A))

133.    The United States re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

134.    Williams knowingly caused to be presented false or fraudulent claims to Medicare for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

135.    During the Relevant Period, Williams, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement of DME that were not medically reasonable or necessary for the diagnosis or treatment of the Medicare beneficiaries for whom the DME were prescribed.  The falsity of these claims was material to payment by the United States.

136.    Because of the above-described conduct, the United States sustained damages in the amount of approximately $632,274.29 and is entitled to treble damages plus a civil penalty for each violation.

## COUNT II - VIOLATION OF THE FALSE CLAIMS ACT
### Making False Records or Statements Material to False Claims
### (31 U.S.C. § 3729(a)(1)(B))

137.    The United States re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

138.    Williams knowingly made false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

139.    During the Relevant Period, Williams, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, made false records or statements material to false or fraudulent claims submitted to the United States, and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of Williams' statements and actions.

140.    These false records and statements included false and misleading statements on DME orders that Williams had examined or was treating a beneficiary when, in fact, she was not doing so.

141.    These false records and statements were material to payment by the United States.

142.    Because of the above-described conduct, the United States sustained damages in the amount of approximately $632,274.29 and is entitled to treble damages plus a civil penalty for each violation.

## PRAYER FOR RELIEF

143.    WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendant as follows:

a. On Counts I and II, under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and for such civil penalties as are authorized by law; and

b. For all such further relief as to the Court seems just and proper.

## JURY DEMAND

The United States requests a trial by jury with respect to all issues so triable.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

_/s/ Alexandra Brazier_
ALEXANDRA BRAZIER
LINDSEY ROSS
Assistant United States Attorneys
John J. Moakley U.S. Courthouse,
Suite 9200
1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3100
alexandra.brazier@usdoj.gov
lindsey.ross@usdoj.gov